20

NOT FOR PUBLICATION

**FILED**

**JUN 29 2011**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| In re:<br>JAMES LARRY SACCHERI and JUDITH ANN SACCHERI,<br><br>    Debtors. | Case No.: 09-17721-B-7<br><br>Adv. No. 09-01273-B |
| ST. LAWRENCE VALLEY DAIRY,<br><br>    Plaintiff,<br><br>    v.<br><br>JAMES LARRY SACCHERI and JUDITH ANN SACCHERI,<br><br>    Defendants. | Dept. F; Courtroom 13, Fresno, California<br>Honorable Richard T. Ford |

## INTRODUCTION

The Plaintiff filed its complaint in the above entitled Court on November 9, 2009. After various other filings, hearings, etc, a Third Amended Complaint was filed on June 25, 2010. It alleged, among other things, that the Defendant owed Plaintiff large sums of money and that these debts are non-dischargeable pursuant to 11 U.S.C. 523 (a)(4) Fraud or Defalcation - acting as a Fiduciary and Breach of Fiduciary Duties; 11 U.S.C. 523 (a)(4) Embezzlement; and 11 U.S.C. (a)(2)(A) Debts obtained by False Pretenses, False Representations, and Actual Fraud.  An answer

1

187

Pretenses, False Representations, and Actual Fraud.  An answer was filed by the defendant On July 12, 2010.

On April 6, 2011 the Court held a Final Pre-Trial hearing and it bifurcated the issues relating to liability from the damage claims.  The fourth claim of the amended complaint for relief against defendant, Judith A Saccheri, was dismissed. The trial relating to liability was set for May 9 and May 10, 2011. At the conclusion of the trial the matter was submitted to allow for further Findings and Briefs.  The matter relating to liability is now ready for a decision.

JURISDICTION

The Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. Jurisdiction exists pursuant to 28 U.S.C. 1334.  Venue is proper under 28 U.S.C. 1409(a).  The District Court has generally referred these matters to the Bankruptcy Court for hearing pursuant to 28 U.S.C. 157(a) and the United States District Court, Eastern District of California, General Orders 182 and 223.  This is a core proceeding within the meaning of 28 U.S.C. 157(b)(2) A and I.  The specific issues raised in the complaint are 523 (a)(4) and 523 (a)(2)(A).

APPEARANCES

Plaintiff appeared by its counsel, Jeff Reich, and the

2

defendant appeared in Pro Per.

FINDINGS OF FACT

1.  On September 4, 2003, the defendant, as sole incorporator of St. Lawrence Valley Dairy, Inc., a California corporation, designated himself the sold director of the corporation and the President, Secretary and Chief Financial Officer of the Corporation.

2.  Also on September 4, 2003, the defendant, as the sole director of the corporation,  signed a real estate purchase contract to purchase an operating dairy farm in Chateaugay, New York, including land, buildings, improvements, livestock, machinery and equipment.

3.  The defendant on September 4, 2003 also prepared a document entitled "Action by Unanimous Written Consent of the Sole Director" wherein  he provided for the setting up of bank accounts and locating the corporations principal executive office to Fresno, California.  Although there was no writing in the corporation papers, including the minutes, the defendant provided himself with a salary of $30,000 per annum, payable $2,500 per month.  The three other directors testified that they allowed this salary although it was never discussed.  On the other hand the defendant testified that in October, 2004, the board of directors and the defendant agreed to modify his compensation so that he would receive  a salary of $52,000 per year as an employee, he would receive $30,000 as a management fee per year

as an independent contractor and he would accrue deferred
compensation of $22,000 per year,  plus he would continue to
receive $250 toward his health insurance costs, and he would
continue to receive reimbursement for all his business and travel
expenses.  This testimony by the defendant was not believable.
It was contrary to the testimony of  all of the other board
members.   There was nothing in writing in any of the books and
records that this agreement was ever made.  In fact there was no
written evidence that he was entitled to any salary, health cost,
or reimbursement of expenses.  It just happened and no one said
anything about it.

The defendant testified that from November 12, 2003 until
February 20, 2008 he sometimes received money from plaintiff in
excess of his compensation.  He said the money received by
defendant was approved by the directors and completely accounted
for by defendant in the books and records as management fees,
expense reimbursements, dividends, loans or interest.  The
monthly payment of $250 for health insurance was shown on the
year end profit and loss statements for 2004, 2005 and 2006.
What the defendant fails to comprehend is that he was not
authorized to take money from the corporation that was not
authorized in advance by the Board.  He  attempted to account for
the funds by listing them in some of the books, somewhere,  as
loans, dividends, interest etc.  These acts of taking
unauthorized funds amounts to embezzlement, fraud, etc and it is

4

no defense to say that he listed them somewhere in the books and records.  That only helps to prove the amount of damages plaintiff is entitled to recover back.

    4.  On November 24, 2003, Michael Montgomery became a member of the board of directors of plaintiff with the defendant and also became Secretary/Treasurer of plaintiff.
Mr Montgomery had been a client of the defendant for over 20 years and had been his friend.  He trusted him completely and anything that defendant wanted him to sign he would sign it-without reading it.

    5.  On April 12, 2004, James Kozera, Joan Kozera, Michael Montgomery and defendant were elected directors of plaintiff, and defendant was elected President; James Kozera was elected Vice-President and Michael Montgomery was elected as Secretary/Treasurer. The Kozeras were also long time clients of defendant.

    6.  Defendant James Saccheri acted as the president (CEO) and as a member of the board of directors of plaintiff,  St. Lawrence Valley Dairy,  from late 2003 until early 2008, when he resigned both positions.  During his tenure, defendant prepared all of the financial books and records of the plaintiff and had control of the checkbooks.

    7.  Each of the other directors, James Kozera, Joan Kozera, and Mike Montgomery, testified that defendant did not have authority to take money from the dairy for his personal use.  The

Kozeras and Mr. Montgomery, all believable and convincing witnesses, did not know defendant was using corporation money for his personal uses. Defendant actively concealed the fact that he was taking money from the dairy.

8. The defendant had a line item on the balance sheet that he called North Country Trust or NC Trust. It supposedly held assets of the dairy that had not been expended, but all it really reflected was the money defendant had taken—his "loans." From late 2003 to the end of 2007 NC Trust had grown to over $400,000.00, reflecting the total sum defendant had taken from the dairy without authorization or knowledge of the board.

9. Defendant misrepresented the financial condition of the company and concealed that he was taking money. The balance sheets for 2004 through 2007 materially misrepresent the financial condition of the company. (Exhibits 17 - 20)

10. Defendant was an attorney for over 20 years. While he resigned from the Bar with charges pending, as an experienced attorney he would have known the importance of documenting financial arrangements made with others. Yet, defendant did not document any of the loans he allegedly received from plaintiff. The money taken was not a loan and it was not authorized.

11. The defendant was also the trustee and drafter of the Palmira Marando Trust. Palmiro Marando is Mr. Montgomery's grandmother. Defendant borrowed $81,525.00 from the plaintiff to repay monies he had taken from the Palmira Marando Trust.

6

(Exhibit 51)  Mr. and Mrs. Kozera and Mr. Montgomery testified that they never authorized the Marando loans and never knew about them.

12.  Defendant was also the representative of the Trenhaile Estate.  Defendant alleged that  he borrowed $152,504.44 from the plaintiff to repay monies he had taken from the Trenhaile Estate.  (Exhibit 51)  Mr. and Mrs. Kozera and Mr. Montgomery testified, and they were believed,  that they never authorized the Trenhaile loans and never knew about them.  The defendant testified that he got permission from the Board to borrow money from the corporation to repay his obligation to Trenhaile. However that testimony is not believable  nor is there any documentation to support his testimony regarding  the transactions involving Trenhaile or Palmira Marando Trust.

13. The Kozeras and Mr. Montgomery made clear that they would only invest in a debt free corporation.  In a prospectus, that the defendant gave to the Kozeras, he emphasized that plaintiff would be entirely investor funded.  (Exhibit 4)  There would be no loans to finance the operation.  The defendant had no source of income or a full time job  in the later part of  2003 to bring in an income and the  Defendant was desperate to buy and  fund the business.  He then planned a new venture to buy a dairy in New York, but he had no funds to do this.  He got his friends and clients involved. At this point he found that he was still $300,000 short.

The Kozeras each testified that they were on the board of directors as of April, 2004, yet defendant never brought up the subject of borrowing $350,000.00 from Yankee Farm Credit with them, either at a board meeting or otherwise.  They made clear that they opposed any borrowing to finance the startup of the dairy.  The authorization to get the loan was never authorized by a board of directors' vote.  It could not have been authorized because the Kozeras would have opposed it.

14.  Mike Montgomery signed a document that purported to be documentation of a board of directors' resolution authorizing the $350,000.00 loan.  Mr. Montgomery also signed the other papers required by the lender for the loan, including a personal guarantee.( Ex K, L,M,P,O,R,T,U,V)  .

Mr. Montgomery testified that he was unaware of the loan, despite having signed the documents.  Mr. Montgomery explained that he did not read legal papers.  He referred them to his lawyer, defendant, whom Mr. Montgomery absolutely trusted.  Mr. Montgomery would sign whatever papers defendant asked him to sign. Mr. Montgomery explained that defendant was "family," over 40 years before Mr. Montgomery had been in defendant's wedding to his grandmother's first cousin.  Defendant had been Mr. Montgomery's attorney for over 20 years and had been his friend.  Montgomery even signed documents, that he had not read, "under penalty of perjury".  Even though he may have committed a crime,  which is not relevant to these issues, he is completely believable about

signing and not reading ANY documents.

15.    The Kozeras trusted the defendant.  They had known him from as far back as elementary school, and defendant had acted as their attorney on various matters.  In his roles as president and director and the source of corporation financial records, the members of the board of directors trusted defendant and relied on him for his reports on the progress of the dairy. Although the defendant denied that Mr. Montgomery didn't know about the loan, the evidence is convincing that neither Montgomery or the Kozeras knew about the loan.

16.    Yankee Farm Credit required that the loan be secured by a mortgage against the dairy property.  (Exhibit M)  This was a significant long term debt and substantially exceeded any other obligation of the plaintiff.  Yet, nowhere on the financial documents of the plaintiff does defendant ever show the Yankee Farm Credit loan as a long term liability.  The balance sheets of the dairy from 2004 through 2007, prepared by Defendant, materially misrepresented  the financial condition of the company. (Exhibits 17-20)

17.    In late 2007, when Mr. Montgomery first  learned about the Yankee Farm Credit $350,000 loan and that he had guaranteed it, he called a meeting of the shareholders.  Over the next several weeks and  several meetings of the shareholders and directors,  other revelations of what the defendant had been doing came to light.    Defendant first resigned as president and then,

later, resigned from the board of directors.

18.  At the April 1, 2008, shareholder meeting, "He [defendant] was asked about why he took money from the dairy operations.  His reply was that he was in debt from his declining law practice 1995 to 2000.  Then from 2000 to 2004 he accumulated even more personal consumer debt."  ( Page 6, Exhibit 29)

19.  After negotiations, defendant entered into a settlement agreement with plaintiff.  As part of the settlement, defendant agreed to pay $375,000.00 evidenced by two promissory notes (one for $299,000.00 and the other for $76,000.00, the latter of which was secured by a deed of trust on defendant's house).  (Exhibits 10-13)  Defendant paid on the notes for a few months but then defaulted.

20.  The minutes of the April 1, 2008, meeting reveal, "Jim [defendant] states that he intends to pay back all money owed by him to the dairy including the payment of the Yankee Farm Credit loan (using the dairy as collateral) he obtained in 2004 in order to "fund" his shares."  (Exhibit 29)

21.  Regarding the stock subscription agreements, the documents  establish that investors would not receive their stock until they paid cash at $100.00 per share.  (Exhibit 33) The defendant did not pay cash for the more than 3,000 shares he received.  He did, however, take over $38,000.00 in dividends on those shares.  (Exhibits 45, 46)

From 2003 until 2008, the other directors were not aware that

10

defendant had not paid for his shares.   There was no reference in any of the financial documents that defendant had received his shares on credit.   The balance sheets of the plaintiff, all prepared by defendant, totally  misrepresented the financial condition of plaintiff.  (Exhibits 17-20)

22.  As president,  director and  trustee of the funds of the plaintiff, defendant was a fiduciary of the plaintiff and owed the plaintiff fiduciary duties of loyalty and care.

23. Defendant committed both fraud and defalcation while so acting as a fiduciary of plaintiff.

24.  Defendant misrepresented and concealed that he was taking funds from plaintiff for his own use.

25.  Defendant knew that the funds belonged to plaintiff and that he should ask for permission, first, to take them, but did not do so, because he knew permission would be denied.

26.  Defendant intended that plaintiff rely on his misrepresentations and concealment.  His false presentations of plaintiff's financial condition through the balance sheets were intended to lull the other members of the board of directors into a false sense of confidence about the financial condition of plaintiff.

27.  The other directors did, in fact, justifiably  rely on defendant's misrepresentations and concealment.  They had no reason not to believe him.  The financial documents all looked good; those documents concealed the money defendant had taken from

11

plaintiff.  Until his deceit was discovered, defendant never revealed that he was taking money from the plaintiff that he should not be taking.

28.  Plaintiff was clearly damaged by defendant's misrepresentations and concealment.  The money defendant took to repay the money he took from the Marando Trust and the Trenhaile Estate are examples of the damages.  Plaintiff has not recovered this money.  Defendant's so-called loans from plaintiff have not been repaid; defendant defaulted on his agreement to repay that money.

29.  These actions by defendant constituted fraud while acting in a fiduciary capacity and also constituted clear breach of his fiduciary duties to plaintiff.  The obligations he incurred thereby are not dischargeable under 11 U.S.C. §523(a)(4).

30.  As president and as a director, defendant was an agent and fiduciary of plaintiff.  In those roles defendant had care, custody and control over the finances of plaintiff, including the financial books and records.

31.  In that role, defendant took and converted to his own use and benefit substantial funds belonging to plaintiff.  He concealed this fact from the other directors and shareholders.

32.  These actions by defendant constituted embezzlement; the obligations defendant incurred thereby are not dischargeable under 11 U.S.C. §523(a)(4).

33.  Defendant obtained dividends from plaintiff through

12

false pretenses, false representations and fraud.

34.   The stock subscription agreements and the understandings of everyone participating was that no one would receive shares until the stock was paid for.  Defendant falsely represented to everyone that he had purchased over $300,000.00 of shares at $100.00 a share, when he, in fact, paid nothing for them.

35.   Defendant took over $38,000.00 in dividends to which he was not entitled.

36.   These actions by defendant constituted fraud and he obtained  funds by false pretenses; the obligations defendant incurred thereby are not dischargeable under 11 U.S.C. §523(a)(2)(A)..

37.   Defendant  misrepresented and concealed the $350,000.00 Yankee Farm Credit loan from plaintiff.  At the April 1, 2008, shareholders' meeting, defendant stated:  "Jim [defendant] states that he intends to pay back all money owed by him to the dairy including the payment of the Yankee Farm Credit loan (using the dairy as collateral) he obtained in 2004 in order to 'fund' his shares."  (Exhibit 29)  For that whole time, from 2004 to late 2007, defendant had been able to actively conceal and hide the fact that he had arranged a loan against the dairy property and had used that loan to cover what he should have invested in the plaintiff to begin with.

38.   Defendant knew that the other directors and shareholders would not approve borrowing money in order to establish the dairy

business.  Defendant also knew that the others would not approve
of him becoming a shareholder without investing the funds required
to purchase the shares.

39.  Defendant intended that the others rely on his
misrepresentations and concealment.

40.  The other directors did justifiably  rely on his
misrepresentations and concealment.  Defendant had to trick Mike
Montgomery into signing necessary documents for the loan.  But,
that was not hard.  Mr. Montgomery would sign whatever documents
the  defendant - his attorney, friend, and family member--would
give him to sign, generally without reading them.  Mr. Montgomery
was the first director to discover that anything was amiss, when
he called the meeting in late 2007 to discuss what he had
learned—that the dairy had a large loan against it, which he and
defendant had signed for.

41.  Plaintiff was damaged by defendant's machinations.
Thousands of dollars of interest had to be paid on the Yankee Farm
Credit loan.  Money that could have been spent on other things or
returned to the shareholders had to be expended on the principal
of the loan.

42.  These actions by defendant constituted fraud and breach
of fiduciary duty, and embezzlement; Defendant's actions were
willful and malicious; the obligations defendant incurred thereby
are not dischargeable under 11 U.S.C. §523(a)(2) & (4) .

CONCLUSIONS OF LAW

1.  <u>In re Littleton</u>, 942 F.2d 551, 555  (9th Cir. 1991)

provides:

"Clearly, a debt can be nondischargeable for embezzlement
under 523(a)(4) without the existence of a fiduciary
relationship."

Under federal law, embezzlement,  in the context of
nondischargeability, has often been defined as "the fraudulent
appropriation of property by a person to whom such property has
been entrusted or into whose hands it has lawfully come." <u>Moore v.
United States</u>, 160 U.S. 268, 269, 40 L. Ed. 422, 16 S. Ct. 294
(1885). Embezzlement, thus, requires three elements: "(1) property
rightfully in the possession of a nonowner; (2) nonowner's
appropriation of the property to a use other than which [it] was
entrusted; and (3) circumstances indicating fraud." In re Hoffman,
70 Bankr. 155, 162 (Bankr. W.D. Ark. 1986)  <u>In re Schultz</u>, 46
Bankr. 880, 889 (Bankr. D. Nev. 1985).

The Defendant does not dispute the findings  in the Littleton
case but he does attempt to add to the decision by emphasizing at
page 555 that there must be a "an intent to defraud".  The Court
refers the defendant to number (3) above wherein it provides for
circumstances indicating fraud.   Fraud requires intent.  So the
defendant's statement is without merit.

2.  <u>Otto v. Niles (In re Niles)</u>, 106 F.3d 1456, 1462 (9TH Cir.
1997) states:

If the principal proves or the agent admits that the agent

15

has come into possession of money or other thing for the principal, the agent has the burden of proving that he has paid it to the principal or disposed of it in accordance with his authority.

Therefore, based upon the Findings of the Court, the defendant has committed conversion of Plaintiff's property in that the subject property (money and personal property) did rightfully come into the possession of Defendant, but then he appropriated it to his own use by spending it or paying his bills and obligations which was not known or authorized by the Plaintiffs Officers/Board members/stock holders, and it was done with a fraudulent intent.

3. 11 U.S.C. 523(a)(4) reads:

"(a) A discharge. . . . does not discharge an individual debtor from any debt...."

"(4) for fraud or defalcation while acting in a fiduciary capacity,........"

The meaning of "fiduciary" in the context of 523(a)(4) is an issue of federal law. In re Short, 818 F.2d 693, 695 (9th cir. 1987); In re Baird, 114 B. R. 198, 202 (9th Cir BAP 1990). Further, "the broad, general definition of fiduciary-a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context." Ragsdale v. Haller, 780 F. 2d 794, 796 (9th Cir. 1986). Section 523 (a)(4) excludes constructive, resulting or implied trusts. A fiduciary relationship for purposes of 523 (a)(4) exists only where there is an express or statutory trust. In re Aubrey, 1111 B.R. 268, 275 (9th Cir. BAP 1990); see also In re Pedrazzini, 644 F. 2d 756, 758

16

n.2 (9th Cir. 1981);"although the concept of 'fiduciary' in the dischargeability context is a narrowly defined question of federal law, courts look to state law to determine whether the requisite trust relationship exists." In re Baird, 114 B.R. at 202; citing Ragsdale, 780 F.2d at 796-97. "If state law creates an  express or technical trust relationship between the debtor and another party and imposes trustee status upon the debtor, the debtor will be a fiduciary under 523 (a)(4)." Baird, 114 B. R. At 202.  See also In re Cantrell, 329 F. 3rd 1119, 1125 (9th Cir. 20030

Certain relationships are generally recognized as involving fiduciary obligations within the meaning of section 523(a)(4). "The president of a private corporation entrusted with funds for a particular purpose"— Moreno v. Ashworth (In re Moreno), 892 F. 2d 417 (5th Cir.  1990).

Based on the courts findings above, the defendant is a fiduciary.  The next question then is has there been a fraud or defalcation and whether it was committed in relation to the debtor's responsibilities. Bugna v. McArthur (In re Bugna), 33 F.3rd 1054 (9th Cir. 1994).

Defalcation is defined as the misappropriation of trust funds or money held in a fiduciary capacity.  In re Lewis, 97 F 3rd 1186 (9th Circ 1996).  Vizcaino v. Microsoft Corp., 97 F3d 1187 (9th Cir. 1996)  It includes the innocent default of a fiduciary who fails to account fully for money received.  In re Short, 818 F 2d at 694. To the extent In re Martin, 161 B.R. 672 (9th  Cir. BAP

1993) conflicts with this standard, it is overruled.   An

individual may be liable for defalcation without having the intent

to defraud.

Finally, turning to fraud, section 523(a)(4) requires actual

fraud as defined by state law.   See <u>Roussos v. Michaelide</u>, 251

B.R. 86,94 (BAP 9th Cir. 2000).   In California, the plaintiff must

show the following to prove actual fraud; (1) misrepresentation,

concealment or non-disclosure of a material fact; (2) made

consciously by the defendant; (3) with the intent and purpose to

deceive or induce the plaintiff; (4) justifiable reliance by the

plaintiff; and (5) a resulting damage.   <u>Odorizzi v. Bloomfield

School</u>, 246 Cal App 2d 123, 128 (1966).

Clearly the evidence elicited in this case fulfills the five

requirements  set for above.

4.   The plaintiff's third claim is for "Money and Goods

Obtained by False Pretenses, False Representation or Actual

Fraud".   The 9th Circuit has outlined the five elements which a

creditor must prove in order to prevent a debtor' discharge from

entering under 11 U. S. C. 523(a)(2)(A);   (1) the debtor makes the

representations; (2) that at the time he knew they were false;

(3) that he made the representations with the intent and purpose

of deceiving the creditor; (4) that the creditor relied on such

representation; (5) that the creditor sustained the allege loss

and damage as a proximate result.   <u>In re Kirsch</u>, 973 F. 2d 1454,

1457 (9th Cir., 1992).   Each element must be established by a

preponderance of evidence.  <u>In re Slyman</u>, 234 F.3rd 1081,1086 (9th Cir. 2000).  The creditors  reliance must be "justified".  <u>In re Kirsh</u>, 973 F. 2d 1454, 1460 (9th Cir. 1992).

These five elements have all been proven by plaintiff  by a preponderance of evidence.  The money the defendant took was disguised as loans. The defendant took dividends  although he had not paid for his shares as was required. The plaintiffs were required to pay  interest and principal on the $350,000 Yankee Farm Credit loan that defendant hid from plaintiff.

5.  As  to the new claims Plaintiff is attempting to make pursuant to 11 U.S.C. 523(a)(6)  in his proposed Findings of Fact, this claim was not set forth in the Third Amended Complaint, nor was that claim discussed or provided for  in the Final Pre-Trial Order.  Likewise  there was no consent by Defendant to pursue that claim at trial. In reviewing plaintiffs proposed findings at page one, line 26through 28 no such claim was made.  Therefore the court will not entertain a request pursuant to 11 U.S.C. 523(a)(6) for a  Judgment on those grounds.

CONCLUSION

The Court finds that Defendant is liable for a debt in a unspecified amount  to Plaintiff and that the debt is not dischargeable pursuant to 11 U. S. C. 523(a)(2)(A) and 11 U.S.C. 523(a)(4).

The Court sets the date of July 11, 2011, at 11:30 a.m. in

19

Department F, Courtroom 13 for a further status conference hearing
to set a discovery cut off date, if requested, and to fix a trial
date to hear the matters regarding damages.

DATED:    June 29, 2011.


                                    _____
                                    RICHARD T. FORD, Judge
                                    United States Bankruptcy Court