15

**NOT FOR PUBLICATION**

FILED
APR 06 2012
UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

In re:
JAMES LARRY SACCHERI and
JUDITH ANN SACCHERI,

Debtors.

Case No.: 09-17721-B-7

ST. LAWRENCE VALLEY DAIRY,

Plaintiff,

v.

JAMES LARRY SACCHERI and
JUDITH ANN SACCHERI,

Defendants.

Adv. No. 09-01273-B

Place: 2500 Tulare Street, Dept. B,
Courtroom 13, Fresno, California
Dept: Honorable Richard T. Ford

FINDINGS OF FACT AND CONCLUSIONS OF LAW

This adversary matter was bifurcated for trial on April 5, 2011. The first trial involving liability was tried by this Court on May 9 and May 10, 2011. The parties submitted proposed findings and the Court issued its Findings, Conclusions, and Judgment on June 29, 2011. The Court concluded that Mr Saccheri was liable for a debt in an unspecified amount to Plaintiff and that the debt was not dischargeable pursuant to 11 U.S.C. 523(a)(2)(A) and 11 U.S.C. 523 (a)(4).

On July 18, 2011, Plaintiff filed its "Fourth Amended Complaint" which restated its "Third Amended Complaint" and added a "Fifth Claim for Relief" requesting that the community property of the Defendants be declared liable for the nondischargeable debts of Mr. Saccheri. The Defendants each filed answers to the "Fourth Amended Complaint", Mr. Saccheri, in pro

236

per, and Mrs. Saccheri, by her attorney, M. Nelson Enmark.

The Damage phase then proceeded to trial before Judge Ford on November 29, November 30 and December 1, 2011. Plaintiff was represented at trial by attorney Jeff Reich and Mr Saccheri represented himself, in pro per. Mrs. Saccheri's attorney, M. Nelson Enmark, appeared only on the first day of the trial and only to stipulate that Mrs. Saccheri was married to Mr. Saccheri during the time period covered by Plaintiff's complaint and that she was still married to Mr. Saccheri, he did not appear during the subsequent testimony regarding damages.

The Court finds in favor of plaintiff as follows:

**Findings of Fact (in addition to those Findings made by this Court on June 29, 2011)**

Defendant Mrs. Judith Saccheri is Defendant James Saccheri's wife, she has been his wife for years, was his wife throughout the period he was an officer and director of Plaintiff and afterwards, including but not limited to the entire period of this pending lawsuit. Mrs. Saccheri's attorney stipulated that Mrs. Saccheri was, in fact, married at the time this happened and also that she is currently married to Mr. Saccheri (RT, 5) (RT, 316). Mrs. Saccheri is a party to only the fifth cause of action in the Fourth Amended Complaint.

The chart included herein sets forth each of Plaintiff's damages claims and each of Defendant James Saccheri's claims for reimbursement. The chart also states whether the pertinent amount should be a charge against Defendants as damages to Plaintiff or whether Defendants should receive a credit against what they owe, or alternatively, whether Defendants claim should be disallowed.

| | Category | Amount | Charge | Credit | Disallowed |
|---|---|---|---|---|---|
| 1 | Smith Loan | $ 7,500.00 | X | | |
| 2 | Dr. Lee | $ 22,333.35 | X | | |
| 3 | Mirando | $ 81,525.00 | X | | |
| 4 | Trenhaile | $ 152,504.44 | X | | |
| 5 | Chrysler Trust | $ 15,450.00 | X | | |

| | | | | | |
|---|---|---|---|---|---|
| 6 | PG&E | $ 1,044.47 | | X | |
| 7 | CSAA | $ 402.00 | X | | |
| 8 | Perez Rent | $ 7,400.00 | | X | |
| 9 | Health Care | $ 6,000.00 | X | | |
| 10 | Claim on Health Care payments he did not take | $ 6,500.00 | | | X |
| 11 | 5 checks | $ 9,600.00 | X | | |
| 12 | Claim 1 check on organization expenses | $ 1,000.00 | | X | |
| 13 | ATM | $ 61,444.63 | X | | |
| 14 | Exceptions to ATM charges | $ 1,531.48 | | X | |
| 15 | 3 BofA checks | $ 14,937.31 | X | | |
| 16 | Claim 1 check on organization expenses | $ 1,500.00 | | | X |
| 17 | Home Payments | $ 34,418.52 | X | | |
| 18 | 2003 Checks | $ 16,046.61 | X | | |
| 19 | Claim Furniture & Equipment | $ 5,000.00 | | | X |
| 20 | Organizational Expenses | $ 11,046.61 | | | X |
| 21 | 2004 Checks | $ 60,530.78 | X | | |
| 22 | 2005 Checks | $ 72,300.00 | X | | |
| 23 | 2006 Checks | $ 42,850.00 | X | | |
| 24 | 2007 Checks | $ 44,625.00 | X | | |
| 25 | 2008 Checks | $ 6,700.00 | X | | |
| 26 | 2004 Dividends | $ 22,061.00 | X | | |
| 27 | 2005 Dividends | $ 16,650.00 | X | | |
| 28 | Yankee Farm Credit Interest | $ 88,566.00 | | | X |


| | | | | | |
|---|---|---|---|---|---|
| 29 | Yankee Farm Dividend | $ 14,943.44 | | X | |
| 30 | Promissory Notes Interest | $ 47,464.22 | X | | |
| 31 | Management Fee | $ 130,000.00 | | X | |
| 32 | Cash Receipts | $ 12,424.73 | | X | |
| 33 | Reimbursements | $ 43,950.43 | | X | |
| 34 | Organization | $ 18,024.00 | | X | |
| 35 | Montgomery Stock Purchase | $ 50,000.00 | | | X |
| 36 | Chrysler Family Trust | $ 19,265.00 | | | X |
| 37 | Promissory Notes - - Four Payments | $ 3,596.00 | | X | |
| 38 | Fractional Payments on Stock Dividends | $ 300.00 | | X | |
| 39 | $10,000 Saccheri claims he paid for stock | $ 10,000.00 | | | X |
| 40 | Claims Payment to Dairy | $ 200.00 | | X | |
| 41 | Claims Wire Transfer | $ 3,000.00 | | X | |
| 42 | Claims Wire Transfer | $ 500.00 | | X | |
| 43 | Claims check to Dairy | $ 350.00 | | X | |
| 44 | Claims American Express charges not reimbursed | $ 6,071.74 | | X | |

| | | |
|---|---|---|
| TOTAL CHARGES | $ | 736,342.86 |
| TOTAL CREDITS | $ | 244,336.29 |
| TOTAL DAMAGES | $ | 492,006.57 |

1. The Smith loan of $7,500.00 Defendant admitted he owes. (RT, 264).

2. Defendant claims he should not be charged for the $22,333.35 payment made to Dr. Lee. Plaintiff asserts that it never authorized any such payment to Dr. Lee. The memo on the check itself references "Marble River RE Dev," identifying some other project of defendants. Exhibit 16. Defendant's claim should be disallowed, and Defendants are charged with the Dr. Lee check as damages to Plaintiff.

3. Defendant admitted that he should be charged for all of the Mirando Trust checks, $81,525.00. (RT, 264)

4. Defendant admitted he should be charged on the Trenhaile checks, $152,504.44.

5. Defendant argues that he should not be charged with the checks to the Chrysler Trust. (RT, 264-267). Plaintiff maintains that these payments were never authorized. (RT, 11) Defendants should be charged with the Chrysler Trust checks as damages to plaintiff, $15,450.00.

6. Defendant contends that he had an arrangement with Plaintiff pursuant to which Plaintiff was to pay ½ of the PG&E bills at defendant's office. Plaintiff asserts that it never authorized any such expenditure. There is no documentation supporting defendant's claim but it seems reasonable that the bill should have been expected and the Court will allow it.

7. Defendant admitted that he owes the four CSAA checks totaling $402.00.

8. Regarding the rent on his office, defendant argues that he had an arrangement whereby Plaintiff would pay for ½ the rent and he would pay the other ½. (RT, 268) Plaintiff asserts that Defendant was never authorized to take money to pay for his rent. (RT, 12) The Court finds that it would be foreseeable that Defendant should be reimbursed for some rent for using his private office space and therefore the Court will allow a credit to Defendant for $7,400.00

9. Defendant maintains that plaintiff authorized him to withdraw $250.00 per month to pay for health care insurance. (RT, 269-270) Plaintiff maintains that no withdrawals for

health insurance were ever authorized. (RT, 13) There was no documentation supporting Defendant's claim. Moreover, Defendant did not withdraw $250.00 every month and pay it but did so less than half the time. The Court finds it reasonable to allow the credit to Defendant.

    10.    Defendant goes on to claim that he should receive a further credit for the health care payments he did not directly take totaling $6,500.00. (RT, 269-270). Defendant's claim should be disallowed, and Defendants should not be allowed any credit against damages for the $6,500.00 in health care payments they didn't take.

    11.    Plaintiff contends that the 5 checks for $10,600.00 are damages it suffered. The Defendant agrees. ( RT 270-271)   That position is correct subject to the claim in number 12 below.

    12.    Defendant alleges that he should receive credit for 1 of the 5 checks, for $1,000.00, since it was for organizational expenses. (RT, 270)   The Court agrees.

    13.    Plaintiff claims $61,444.63 in unauthorized ATM expenses. (RT, 275)   That position is correct subject to the claim in number 14 below.

    14.    Defendant claims a few exceptions to the ATM charges in 13, constituting a claim of $1,531.48. Plaintiff does not dispute that offset.

    15.    Plaintiff contends that the three B of A checks for $14,937.31 are damages it suffered. The Defendant agrees. (RT, 271)   That position is correct subject to the claim in number 16 below.

    16.    Defendant alleges that he should receive credit for 1 of the 3 checks, for $1,500.00, since it was for organizational expenses. (RT, 271) Although the Plaintiff believes the credit should be disallowed, the Court finds it reasonable and will allow the credit of $1.500.00 .

    17.    Defendant admitted that he should be charged for all of the home payment checks, totaling $34,418.52. (RT, 272)

18. Plaintiff asserts $16,046.61 in unauthorized checks were written in 2003. (RT, 16) Defendant denies that assertion as set forth in 19 and 20 below. Plaintiff's position is correct, and Plaintiff has been damaged in that amount.

19. Defendant asserts that $5,000.00 of the money he took was spent on furniture and equipment. However, none of the checks in Exhibit 16 pertaining to 2003 were made out to furniture stores or equipment outlets. They were all made out to Defendant. Defendant's claim should be disallowed. By education and by professional experience as an attorney, Defendant was well aware that he should document everything, especially when involved in self-dealing efforts. He did not.

20. Once again, for the 2003 checks, Defendant asserts that the balance, some $11,046.61, was for organizational expenses and he was entitled to be reimbursed for those. . Defendant's claim should be disallowed. By education and by professional experience as an attorney, Defendant was well aware that he should document everything, especially when involved in self-dealing efforts. He did not.

21. Defendant admitted that he should be charged for all of the 2004 checks, totaling $60,530.78. (RT, 273)

22. Defendant admitted that he should be charged for all of the 2005 checks, totaling $72,300.00. (RT, 273)

23. Defendant admitted that he should be charged for all of the 2006 checks, totaling $42,850.00. (RT, 273)

24. Defendant admitted that he should be charged for all of the 2007 checks, totaling $44,625.00. (RT, 273)

25. Defendant admitted that he should be charged for all of the 2008 checks, totaling $6,700.00. (RT, 274)

26. Plaintiff maintains it suffered damages when defendants received dividend benefits of $22,061, which they reported on their income tax return for 2004. Defendants should

never have received this dividend benefit because they had never validly purchased shares in plaintiff.

27. Plaintiff maintains it suffered damages when Defendants received dividend benefits of $16,650, which they reported on their income tax return for 2005. Defendants should never have received this dividend benefit because they had never validly purchased shares in plaintiff.

28. Plaintiff contends that the Yankee Farm Credit interest payments it made on the unauthorized $350,000.00 loan in the amount of $88,566 are damages it suffered. Plaintiff received all the benefits of the loan which was entirely used to complete Plaintiff's purchase of its livestock, equipment, land and improvements located in New York. So even though the loan was unauthorized, the interest paid should not be considered damages allowed against the Defendant.

29. From the $88,566 interest paid as stated above, the Plaintiff received patronage dividends of $14, 943.44 which should in any event be subtracted from the total interest paid. The Plaintiff agrees with this calculation.

30. After the Defendant's conduct had been discovered in late 2007, discussions between the parties as to what defendant owed were commenced. Defendant signed a settlement agreement and two promissory notes acknowledging a debt to Plaintiff of $375,000.00. Those promissory notes (Exhibits 5 & 6) provided for interest at 4.5%. After adjustments for payments made by Defendants (No. 37 below), defendants owe at least $47,464.22. (Exhibit 15) The Court was reluctant to award the interest claimed as set forth in the settlement and two promissory notes but there is no other way to compensate the Plaintiffs for there loss of their property and money except by allowing interest. Since no other interest calculations were offered by either party, it seems reasonable to allow the interest that the parties agreed upon in the documents noted above.

31. Plaintiff acknowledges that its agreement with Defendant provided that he would receive $30,000.00 a year as a management fee, $2,500.00 a month. For the period he was retained, some 52 months, Defendant was entitled to a total payment of $130,000.00, which should be credited against the amount he owes Plaintiff.

32. Plaintiff acknowledges that Defendant should be credited with $12,424.73 in cash receipts he covered.

33. Plaintiff acknowledges that Defendant should be credited with $43,950.43 in reimbursements covering his deposits into Plaintiff's accounts of $10,000.00 on November 2, 2005, $5,000.00 on October 6, 2006 and $19,250.00 on October 23, 2006; and for reimbursements of grain payments he made for Plaintiff of $6,672.49 on October 16, 2006, and $2012.00 on May 17, 2007; and for reimbursement of other miscellaneous payments for Plaintiff which Mrs. Kozera could not recall in her testimony but stipulated to by Plaintiff in his proposed findings on page 9.

34. Defendant maintains that he should be allowed a credit for organizational costs that the corporation allegedly incurred as set up costs. Defendant asserts that the organizational costs were included in each of the Plaintiff's balance sheets and everyone knew about them. Plaintiff asserts that these organizational costs were never discussed, were never explained, and were never ratified. By education and by professional experience as an attorney, Defendant was well aware that he should document everything, especially when involved in self-dealing efforts. He did not. His claim now that he should be allowed to deduct the sum of $18,024.00 from what he owes is disallowed.

35. In his financial manipulations, defendant arranged for Mike Montgomery to purchase $50,000.00 worth of plaintiff's stock from Dr. Lee. But, instead of having Mr. Montgomery just give his $50,000.00 to Dr. Lee, for some as yet inexplicable reason, he had Mr. Montgomery pay his $50,000.00 to Plaintiff. Then, several months later, when Plaintiff apparently no longer had the $50,000.00, Defendant paid directly to Dr. Lee $50,000.00 he had

obtained from re-financing his home. Now, Defendants want a credit for the $50,000.00. But ,Plaintiff did not receive $50,000.00 from Defendants; Plaintiff received $50,000.00 from Mr. Montgomery. Plaintiff was not a third party beneficiary of Defendants' payment to Dr. Lee: plaintiff did not owe the money to Dr. Lee. Defendants may have a claim against Mr. Montgomery, although that issue is not before this court. They do not have a claim against plaintiff. The $50,000.00 payment to Dr. Lee is not allowed as a credit against the damages Defendants owe to plaintiff.

36. Defendant alleges that Defendants should receive credit for $19,265.00 the Chrysler Family Trust paid to Plaintiff. Defendant alleges that it was money he was due for an investment he had made, apparently with Plaintiff's funds (See number 5 above). Defendants should not be rewarded for Defendant's financial machinations. Defendant may have a claim against the Chrysler Trust; he does not have this claim against Plaintiff. The claim by Defendant is disallowed.

37. Defendants made four payments of $1,899.00 each, totaling $3,596 on the promissory notes Defendant signed when they originally settled the matter. While they subsequently defaulted, Plaintiff acknowledges that Defendants should receive credit for that amount.

38. Defendant claims that he paid some money for fractional shares in the company based on stock dividends. Plaintiff estimates the amount is $300.00 and acknowledges that amount should be a credit for Defendants against damages Plaintiff sustained.

39. Defendant claims he should receive a credit for $10,000.00 he invested in Plaintiff to buy stock. There is no clear evidence to support Defendant's allegations. By education and by professional experience as an attorney, Defendant was well aware he should document everything, especially when involved in self-dealing efforts. He did not. This claim is disallowed.

40. Defendant claims he made a $200.00 payment to Plaintiff. Plaintiff does not object to that credit.

41. Defendant claims he made a $3,000.00 wire transfer to Plaintiff. Plaintiff does not object to that credit.

42. Defendant claims a wire transfer of $500.00 to Plaintiff. Plaintiff does not object to that credit.

43. Defendant claims that he paid $350.00 by check to plaintiff. Plaintiff does not object to that credit.

44. Defendant claims $6,071.74 in credit card charges he incurred that were not reimbursed by Plaintiff. Plaintiff does not object to that credit.

Adding up all the charges against Defendants totals $833,353.33. Adding up the credits Defendants should be allowed comes to $216,867.82. Therefore, the total damages in this case are $616,485.51. These figures are all reflected in the Table on pages 3 and 4.

**Conclusions of Law (in addition to those Conclusions set forth in those findings made by the Court on June 29, 2011.)**

1. Declaratory Relief on reference Defendant Judith Ann Saccheri

A wife's community assets are subject to the claims of creditors holding nondischargeable debts against her spouse. In re Soderling, 998 F.2d 730 (9th Cir. 1993)

"For purposes of §541(a)(2), all community property not yet divided by a state court at the time of the bankruptcy filing is property of the bankruptcy estate. In Miller v. Walpin (In re Miller), 167 B.R. 202 (Bankr.C.D.Cal.1994), the California Superior Court had dissolved the marriage, but retained jurisdiction to divide the community property. Before such division occurred, the wife filed for bankruptcy. "Under California law, the event which terminates liability of community property for community debts as well as debts of the other spouse is division of the community property, not dissolution of the status of the marriage." Id. at 208.

Thus, the bankruptcy court held that all community property of the divorcing couple was property of the bankruptcy estate where division of the community property had not occurred as of the date the bankruptcy was filed.

Community property in California is "all property, real or personal, whenever situated, acquired by a married person during the marriage while domiciled in the state." Calif Family Code Section 760. Community property is "liable for a debt incurred by either spouse before or during marriage, regardless of which spouse has the management and control of the property and regardless of whether one or both spouses are parties to the debt or to a judgment for the debt."Calif Family Code Section 910. However the separate property of a married person is not liable for a debt incurred by the person's spouse before or during the marriage." Calif Family Code Section 911. A debt is an "obligation incurred by a married person before or during marriage, whether based on contract, tort, or otherwise. " Calif Family Code Section 902/

Pursuant to California law, a division of property is the event that will sever the liability of community property for community debts, and, until division, all community property of the divorcing couple is property of the bankruptcy estate pursuant to §541(a)(2)." (In re: John R. Mantle, Debtor (1998) Ninth Circuit, No., 153 F.3d 1082) .

Consequently, Mrs. Saccheri community assets are liable for the $643,467.64 in nondischargeable debts identified in this case as due and owing from Mr. Saccheri.

2. Unclean Hands

"The United States Supreme Court has explained that bankruptcy courts "...are courts of equity and 'appl[y] the principles and rules of equity jurisprudence.'" (Young v. United States, 535 US 43, 50 (2002) (quoting Pepper v. Litton, 308 US 295, 304 (1939); see also Bank of Marin v. England, 385 US 99, 103 (1966).) Those who come to equity seeking relief must do so with clean hands.

The doctrine of unclean hands is equitable in nature and "demands that a [party] act fairly in the matter for which he seeks a remedy." (Hopper v. Everett, 364 B.R. 711, 723 (Bankr. D. Ariz 2007) It may be employed by a court to deny equitable relief "where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." (Performance Unlimited v. Questar Publishers, 52 F3d 1373, 1383 (6th Circ 1995))

Clearly, Mr. Saccheri should not receive any benefit of the doubt. He committed nondischargeable acts over a substantial period of time, deceiving people who trusted him, as their attorney, as their friend, and as someone they'd known for years, for most of their lives.

3. Attorney Fees

The Settlement Agreement (Exhibit 4) and the two promissory notes (Exhibits 5 and 6) each provide for attorney's fees if Defendant breaches the agreement. For example, the Settlement Agreement provides:

"11. ATTORNEY'S FEES. If either party to this Agreement initiates any enforcement action or brings any action for any relief against the other, declaratory or otherwise, for the purpose of enforcing this Agreement or pursuing a breach thereof, the losing party shall pay to the prevailing party a reasonable sum for attorney's fees incurred in bringing such action and/or enforcing any judgment granted therein."

For four months after signing the Settlement Agreement, Defendants made payments pursuant to the Agreement. Then, they defaulted, and Plaintiff subsequently brought this action against them. It is pursuant to that Settlement Agreement that Plaintiff seeks attorney's fees herein.

"Our reading of the Bankruptcy Code's plain language is reinforced by the principal that attorney's fees are properly awarded to a creditor prevailing in a bankruptcy claim if there exists a

statute or valid contract providing therefor." Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 717, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967); In re Martin, 761 F.2d at 1168; Nat Harrison Assoc., Inc. v. Gulf States Utilities Co., 491 F.2d 578, 588-589 (5th Cir.1974). Section 523(a)(2)(A) and Section 523(a)(4) does not expressly state that creditors successful in dischargeability proceedings are entitled to recover attorney's fees. Thus, we must examine the enforceability of the provision in the Note entitling this Plaintiff to recover attorney's fees. "Allowing TranSouth to recover attorney's fees under the circumstances of this case will not contravene the "fresh start" policy of the Bankruptcy Code, which was designed to protect the honest debtor. The debtor attempting to abuse the proceedings of bankruptcy is not entitled to the complete medley of Bankruptcy Code protections. The Bankruptcy Code thereby attempts to discourage such abuse. Fraudulent conduct is best discouraged, not only by denying discharge, but also by ... [recognizing that] the creditor who has been defrauded is entitled to all of its rights under the contract, including reasonable attorney fees." In re Sears (Pacific Bancorporation v. Sears), 102 B.R. 781, 785 (Bankr.S.D.Cal.1989) (quoting Chase Manhattan Bank v. Birkland, 98 B.R. 35, 37 (Bankr.W.D.Wash.1988))." (Transouth v. Johnson (1991) 931 F.2d 1505, 11th Circuit App.)

**Conclusion**

As set forth above, Plaintiff is entitled to judgment against Defendants in the total nondischargeable amount of $399,131.35, plus attorney's fees and costs. The Plaintiff shall have fourteen days to file with the clerk its application and declaration for attorney fees and costs and the Defendants shall have an additional fourteen days to file with the clerk its opposition and declaration for attorney fees and costs. Hard copies of those documents shall be delivered to the court in an envelope marked "Deliver to Judge Ford." A final Judgment will then be issued.

Dated: 4-6-12

RICHARD T. FORD, Judge
United States Bankruptcy Court

service list for 09-1273:

Jeff Reich, Esq.
THE REICH LAW FIRM
8441 N. Millbrook, Suite 104
Fresno, CA 93720

James L. Saccheri
P. O. Box 7954
Fresno, CA 93747